893 So.2d 376 (2004)
Ex parte TED'S GAME ENTERPRISES.
(In re State of Alabama ex rel. John M. Tyson, Jr., District Attorney
v.
Ted's Game Enterprises et al.)
1021125.
Supreme Court of Alabama.
May 28, 2004.
*377 John M. Bolton III of Sasser, Littleton & Stidham, P.C., Montgomery, for petitioner.
William H. Pryor, Jr., atty. gen.; Nathan A. Forrester, deputy atty. gen.; and Michael B. Billinglsey and Yvonne A.H. Saxon, asst. attys. gen.; and John M. Tyson, Jr., district atty., and Martha Tierney, asst. district atty., Mobile County, for respondent.
BROWN, Justice.[1]
We granted the petition for a writ of certiorari filed by Ted's Game Enterprises ("Ted's") to address two issues.[2] The first issue is whether Ala. Const.1901, Art. IV, § 65, prohibits the Legislature from authorizing or legalizing coin-operated amusement machines as to which "some skill" influences "in whole or in part" the result obtained by the operation of the machines. The second issue is whether Ala.Code 1975, § 13A-12-76, may, without contravening Ala. Const.1901, Art. IV, § 65, be applied so as to legalize games or activities in which skill does not predominate over chance in determining the outcome. In addressing these issues, this Court must decide whether Art. IV, § 65, which prohibits lotteries, means what it says.

Discussion

I.
Ted's maintains that the plain language of Ala. Const.1901, Art. IV, § 65, and prior caselaw allow the Legislature to promulgate laws authorizing and regulating gambling devices in which chance predominates over skill in determining the outcome.[3] We disagree.
Article IV, § 65, provides:
"The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."
In Opinion of the Justices No. 373, 795 So.2d 630, 634-35 (Ala.2001), the Chief Justice and three Associate Justices of this Court summarized the historical definitions of the term "lottery" in Alabama law:
"Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const., Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.
"According to Sir William Blackstone in his Commentaries on the Laws of England, the term `lottery' encompassed a broad array of activities:
"`[A]ll private lotteries by tickets, cards, or dice ... are prohibited under a penalty ... for him that shall erect such lotteries.... Public lotteries, unless by authority of parliament, and all manner of ingenious devices, under the denomination of sales or otherwise, which in the end are equivalent *378 to lotteries, were ... prohibited....'
"4 William Blackstone, Commentaries on the Laws of England 173. Nevertheless, Alabama courts did not initially adopt such a broad definition. Buckalew v. State, 62 Ala. 334 (1878) (persons who wagered money on a round board and spun a hand fastened in the center in an attempt to register the highest number on the rim and thereby win money did not violate anti-lottery provisions). However, this narrow view was short-lived, and Alabama courts soon defined lotteries as Blackstone did, interpreting the term `lottery' broadly, thus prohibiting a wide variety of activities. See Reeves v. State, 105 Ala. 120, 17 So. 104 (1894) (persons paying for a privilege to spin an arrow located on a circular board for a chance to win an article of jewelry or a sum of money had engaged in a prohibited lottery); Loiseau v. State, 114 Ala. 34, 36, 22 So. 138, 139 (1897) (Court expressly modified Buckalew and held slot machine to be a lottery); Johnson v. State, 137 Ala. 101, 104, 34 So. 1018, 1019 (1903) (slot machine is a lottery); Try-Me Bottling Co. v. State, 235 Ala. 207, 211, 178 So. 231, 234 (1938) (the prohibition of lotteries applies to any scheme in the nature of a lottery).
"Despite this broad interpretation, the courts apparently lacked a consistent judicial standard for determining whether a scheme constituted a lottery.... Consequently, in 1938, this Court provided the following definition of the term `lottery': '(1) A prize, (2) awarded by chance, (3) for a consideration.' Grimes [v. State,] 235 Ala. [192,] at 193, 178 So. [73,] at 74 [(1938)]. This three-pronged definition of `lottery' was based on definitions of that term used by a vast number of authorities, both judicial and nonjudicial, and it is still accepted by the overwhelming majority of jurisdictions, as well as the United States Supreme Court."
795 So.2d at 634-35 (emphasis added; footnote omitted). Discussing the "English Rule" and the "American Rule" concerning the role of chance in defining a lottery, the advisory opinion continued:
"Two dominant paradigms thus evolved concerning the role of chance in defining a lottery: the `English Rule' and the `American Rule.' Under the English Rule, only a scheme that exhibits or involves `pure chance' is a lottery. 34 Am.Jur. Lotteries § 6 (1941). As a result, a scheme involving any skill, no matter how de minimis, will not be classified as a lottery. Several Justices mistakenly expressed this view in Opinion of the Justices No. 358 [, 692 So.2d 107 (Ala.1997)]; however, the prevailing view in the United States is the `American Rule.' Under the American Rule, a scheme is a lottery if chance is the dominant factor in determining the result of the game, even though the result may be affected to some degree by skill or knowledge. 38 C.J. Lotteries § 5 (1925).
"American courts have consistently rejected the English Rule. Most jurisdictions have embraced the American Rule. Bell Gardens Bicycle Club v. Department of Justice, 36 Cal.App.4th 717, 747, 42 Cal.Rptr.2d 730, 749 (1995) (`In determining whether a particular game or scheme is a lottery, the test in California is whether the game is dominated by chance, not whether the winner of the game is determined solely by chance.'); United States v. Marder, 48 F.3d 564, 569 (1st Cir.1995) (`for there to be a lottery, chance must predominate over skill in the results of the game'); Citation Bingo, Ltd. v. Otten, 121 N.M. 205, 207 n. 2, 910 P.2d 281, 283 n. 2 (1995) (`"lottery" is defined as "an enterprise" *379 ... wherein, for a consideration, the participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill'); Harris v. Missouri Gaming Comm'n, 869 S.W.2d 58, 62 (Mo.1994) (`a lottery is a form of gambling in which consideration is paid for an opportunity at a prize, where skill is absent or only nominally present'); Lashbrook v. State, 550 N.E.2d 772, 775 (Ind.Ct.App.1990) (`[c]hance rather than skill must therefore be the dominant factor controlling the award in a lottery'); State v. Dahlk, 111 Wis.2d 287, 296, 330 N.W.2d 611, 617 (1983) (`[c]hance rather than skill must therefore be the dominant factor controlling the award in a lottery'); Roberts v. Communications Inv. Club of Woonsocket, 431 A.2d 1206, 1211 (R.I.1981) (`a scheme constitutes a lottery when an element of chance dominates the distribution of prizes, even though such a distribution is affected to some degree by the exercise of skill or judgment'); National Football League v. Governor of the State of Delaware, 435 F.Supp. 1372, 1385 (D.Del.1977) ('"lottery" should be interpreted to encompass not only games of pure chance but also games in which chance is the dominant determining factor'); Seattle Times Co. v. Tielsch, 80 Wash.2d 502, 507, 495 P.2d 1366, 1369 (1972) (`Chance within the lottery statute is one which dominates over skill or judgment.'); Johnson v. Phinney, 218 F.2d 303, 306 (5th Cir.1955) (`the authorities are in general agreement that if [chance] is present and predominates in the determination of a winner, the fact that players may exercise varying degrees of skill is immaterial; and the game or device is a lottery'); State v. Hudson, 128 W.Va. 655, 665, 37 S.E.2d 553, 558 (1946) (`where ... chance predominates, even though skill or judgment may enter to some extent in the operation of a particular scheme or device, the scheme or device is a lottery'); Commonwealth v. Lake, 317 Mass. 264, 267, 57 N.E.2d 923, 925 (1944) (`by the weight of authority a game is now considered a lottery if the element of chance predominates'); State ex rel. Dussault v. Kilburn, 111 Mont. 400, 404, 109 P.2d 1113, 1115 (1941) (`whether the element of skill predominated over the element of chance' determined whether game was a lottery); State ex Inf. McKittrick v. Globe-Democrat Pub. Co., 341 Mo. 862, 875, 110 S.W.2d 705, 713 (1937) (`a contest may be a lottery even though skill, judgment, or research enter thereinto in some degree, if chance in a larger degree determine the result'); Hotel Employees & Rest. Employees Int'l Union v. Davis, 21 Cal.4th 585, 592, 88 Cal.Rptr.2d 56, 981 P.2d 990, 996 (1999) ('"Chance" means that winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill.'); In re Allen, 59 Cal.2d 5, 6, 27 Cal.Rptr. 168, 377 P.2d 280, 281 (1962) (`The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game.'); Morrow v. State, 511 P.2d 127, 129 (Alaska 1973) (`We think that a game should be classified as one of skill or chance depending on the dominating element, not on the presence or absence of a small element of skill, which would validate the game under the pure chance doctrine.'); State v. Stroupe, 238 N.C. 34, 37, 76 S.E.2d 313, 316 (1953) (`most courts have reasoned that there are few games, if any, which consist purely of chance or skill, and that therefore a game of chance is one in which the element of chance predominates over the element of skill')."
*380 Opinion of the Justices No. 373, 795 So.2d at 635-36 (footnote omitted).
The advisory opinion then discussed, in light of the historical definitions of the terms "lotteries" and "gift enterprises," the broad limitations placed on the Legislature's power to authorize such schemes:
"As stated previously, § 65 not only prohibits lotteries, but it also prohibits any `gift enterprise' or `scheme in the nature of a lottery.' `In this State, therefore, the public policy is emphatically declared against lotteries, or any scheme in the nature of a lottery, both by Constitution and by statutes.' (Emphasis added [in Opinion No. 373].) Try-Me Bottling Co.[v. State,] 235 Ala. [207] at 212, 178 So. [231] at 234 [(1938)].
"`In Try-Me Bottling Co. ... this court expressly called attention to the broad conception set forth in § 65 showing that the prohibition is not only against lotteries but also against any scheme in the nature of a lottery. The very purpose of this broad declaration was to put a ban on any effort at evasion or subterfuge. Whatever may be the view of the courts of other states on the subject of lotteries, these cases show that this court has adopted a broad view of the meaning of the constitutional provision which does not admit of quibbling or narrow construction.'
"Opinion [of the Justices] No. 83, 249 Ala. [516] at 518, 31 So.2d [753] at 755 [(1947)]. (Emphasis added [in Opinion No. 373].) Moreover, the fact that it was necessary to amend the Constitution to except `bingo' from § 65' s blanket prohibition on lotteries also demonstrates the broad construction that section has been given.
"In 1981, the Justices of this Court, quoting Yellow-Stone Kit [v. State], 88 Ala. 196, 7 So. 338 [(1889)], stated:' "[T]he courts have shown a general disposition to bring within the term `lottery' every species of gaming, involving a disposition of prizes by lot or chance, ... which comes within the mischief to be remedied  regarding always the substance and not the semblance of things, so as to prevent evasions of the law...."' Opinion of the Justices No. 277, 397 So.2d 546, 547 (Ala.1981). (Emphasis added [in Opinion No. 373].) Indeed, the Constitution's broad prohibition on all lotteries is evident because the Constitution explicitly condemns `any scheme' containing elements that would make the scheme resemble a lottery."
Opinion of the Justices No. 373, 795 So.2d at 640.
The advisory opinion then concluded:
"[W]here the dominant factor in a participant's failure or success in any particular game or scheme is chance, the scheme is a lottery  despite the use of some degree of judgment or skill. Therefore, in Alabama the American Rule controls, and even if skill is present, it is the question whether chance dominates that determines whether a lottery exists."
Opinion of the Justices No. 373, 795 So.2d at 641.
Accordingly, we hold that Article IV, § 65, means what it says, and prohibits the Legislature from authorizing "lotteries or gift enterprises" that involve games or devices in which chance predominates the outcome of the game, even if "some skill" is involved.

II.
Ted's maintains that coin-operated amusement machines are protected from the criminal gambling statutes of Ala.Code 1975, §§ 13A-12-20 through 13A-12-75, *381 by Ala.Code 1975, § 13A-12-76, commonly referred to as the "Chuck E. Cheese Law." Specifically, Ted's argues that § 13A-12-76 exempts certain "bona fide coin-operated amusement machines" from the criminal gambling statutes. The phrase "bona fide coin-operated amusement machines" is defined, in part, as "every machine of any kind or character used by the public to provide amusement or entertainment ... the result of whose operation depends in whole or in part upon the skill of the player...." (emphasis added). Thus, Ted's argues that as long as coin-operated amusement machines involve "some skill" in their operation, they meet this qualification under § 13A-12-76.
As noted above, Art. IV, § 65, forbids the Legislature from enacting a statute authorizing a lottery. Thus, we hold that § 13A-12-76 may not, without contravening Art. IV, § 65, of the Alabama Constitution, be applied so as to legalize games or activities in which skill does not predominate over chance in determining the outcome.

Conclusion
The judgment of the Court of Civil Appeals is affirmed.
AFFIRMED.
HOUSTON, SEE, LYONS, HARWOOD, WOODALL, and STUART, JJ., concur.
JOHNSTONE, J., dissents.
JOHNSTONE, Justice (dissenting).
We granted the petition for a writ of certiorari filed by Ted's Game Enterprises to address two issues. The first is whether the Court of Civil Appeals erred in holding that "§ 13A-12-76[, Ala.Code 1975,] may not, without contravening [Art. IV,] § 65 of the Alabama Constitution [of 1901], be applied so as to legalize games or activities in which skill does not ... predominate over chance in determining the outcome." The second is whether Art. IV, § 65 prohibits the Legislature from authorizing or legalizing coin-operated amusement machines which allow "some skill" "in whole or in part" to influence the operation of the machines to yield prizes of no more than 25 free replays or of merchandise worth no more than five dollars wholesale, as provided by § 13A-12-76, Ala.Code 1975.
Alabama precedent, as this dissent will demonstrate, requires that we answer the first question in the affirmative and the second in the negative and that we accordingly reverse the judgment of the Court of Civil Appeals. While the opinion of four Justices of this Court in Opinion of the Justices No. 373, 795 So.2d 630 (Ala.2001), supports the opposite conclusions, opinions of the Justices are not binding precedent, South Central Bell Telephone Co. v. State, 789 So.2d 133, 145 (Ala.1999), and certainly the opinion of a minority of this Court is not binding precedent, Rule 16(b), Ala. R.App. P. Likewise, the cases from other states cited by the four Justices in Opinion of the Justices No. 373 are, of course, not binding precedent in this state. See Walls v. Alpharma USPD, Inc., 887 So.2d 881 (Ala.2004).
In September 1998, the State of Alabama, through District Attorney John M. Tyson, Jr., sued to condemn and to forfeit 20 video-game machines, some currency, and certain documents seized by the State from nine convenience stores in Mobile County. The State alleged that the video-game machines were" `slot machines and video gambling devices, paraphernalia, currency and records'" which were subject to forfeiture under § 13A-12-30, Ala.Code 1975. State ex rel. Tyson v. Ted's Game Enters., 893 So.2d 355, 358 (Ala.Civ.App.2002). The State dismissed its forfeiture *382 claims against 12 of the 20 video-game machines and returned them to their owner Ted's Game Enterprises. The eight remaining video-game machines seized by the State were also owned by Ted's. The State amended its complaint to seek, in addition to the forfeiture of the eight remaining video-game machines, a declaratory judgment to the effect that the video-game machines were illegal slot machines and gambling devices, not "bona fide coin-operated amusement machines" protected by § 13A-12-76, Ala.Code 1975.
In a subsequent amendment to its complaint, the State also asked the trial court to declare "the constitutionality of § 13A-12-76 in relation to Alabama Constitution 1901, Art. IV, § 65." Ted's Game Enters., 893 So.2d at 359. After a bench trial, the trial court held:
"[Ted's] presented evidence from which the Court could, and does, find that these are [video-game] machines `the result of whose operation depends in whole or in part upon the skill of the player' and `which, by application of some skill,' entitle the player to some reward. Therefore, they are not per se illegal. Admittedly, skill is a very minor factor, but the statute does not attempt to quantify the amount required.
"The State argues that they are `slot machines' and, as such, are specifically excluded from the protection of § 13A-12-76. The defect in this argument is that if they are `bona fide amusement devices' then, by definition, they are not `slot machines.'
"There is similar problem with the State's argument that § 13A-12-76 extends only to machines `which can be legally shipped interstate according to federal law.' Federal law, 15 U.S.C. § 1172(a), provides:
"`That it shall not be unlawful to transport in interstate or foreign commerce any gambling device into any State in which the transported gambling device is specifically enumerated as lawful in a statute of that State.'
"... Here, the [video-game] machines are enumerated as lawful under § 13A-12-76 and their shipment into Alabama is not illegal under federal law.
"There remains the requirement of § 13A-12-76 that a `single play' of the machine may award the player with no more than 25 free replays or with noncash merchandise or gift certificates `each of which has a wholesale value of not more than five dollars ($5).' The statute further provides that winnings may be accumulated `so long as the amount of tokens or tickets earned on a single play does not exceed five dollars ($5) per unit.'
"Clearly, the [video-game] machines here in issue offered rewards greatly exceeding the statutory limit. For this reason only, they do not meet the definition of `bona fide [coin-operated] amusement machine' and, being without protection of § 13A-12-76, are illegal gambling devices and are subject to forfeiture.
"....
"The State argues in brief that the play of the [video-game] machines constitutes an illegal lottery and suggests that the `Chuck E. Cheese Law' is unconstitutional because of the prohibition in Art. IV, § 65, Constitution of Alabama 1901, that `The legislature shall have no power to authorize lotteries.' However, the State did not include this claim in its complaint."
The trial court refused to address whether § 13A-12-76 violates Art. IV, § 65 of the Constitution. In a "motion to reconsider," the State brought to the attention of the *383 trial court that the State had, in its second amended complaint, challenged the constitutionality of § 13A-12-76  and had served that complaint on the attorney general.
Thereafter, the trial court entered an order addressing the constitutionality of § 13A-12-76. The trial court stated that, because it had "found as a matter of fact that some skill was involved in the operation of the [video-game] machines in question," "the operation of the [video-game] machines does not constitute a lottery and the `Chuck E. Cheese Law' is not unconstitutional for that reason."
On that same day, the State moved for a new trial, which the trial court denied. The State appealed.
On appeal to the Court of Civil Appeals, the State contended that the eight video-game machines owned by Ted's were illegal "slot machines" under § 13A-12-20(10), not "bona fide coin-operated amusement machines" under § 13A-12-76(e)(1). The State further contended that § 13A-12-76, as applied by the trial court, violated Art. IV, § 65 of the Constitution. The Court of Civil Appeals wrote:
"We can only conclude that [the Legislature enacted § 13A-12-76] either for the purpose of (1) affirming or ensuring the legality of certain machines that may commonly be found in restaurants and other retail establishments similar to those described above, or (2) legalizing the operation of certain machines (and the transportation of certain machines) that otherwise would be illegal under our criminal gambling statutes....
"....
"If, as noted previously, the reason for the enactment of § 13A-12-76 is unclear, the manner in which that statute is `constructed' makes it, and its intended relationship to the criminal gambling statutes, an enigma. To begin with, subsections (a) and (c) of § 13A-12-76, by their express terms, merely create exemptions to §§ 13A-12-70 through -75. Sections 13A-12-70 through -75 only prohibit the transportation or possession within a vehicle of certain lottery paraphernalia and authorize the seizure, condemnation, and forfeiture of vehicles transporting such paraphernalia. It is §§ 13A-12-20 through -58 that prohibit generally activities such as the possession, operation, and promotion of gambling devices.
"....
"This Court has struggled at great length to divine the full import of § 13A-12-76 and the reason for its enactment and to solve the `puzzle' of the manner in which it is structured. Our efforts to determine the proper application, if any, of the statute, without considering the effect of § 65, Alabama Const.1901, have yielded no clear ground upon which to rest a judgment in this case. We therefore find it necessary for a proper resolution of this issue, and this case, to turn to the issue of what limits, if any, § 65 imposes on the application of § 13A-12-76."
Ted's Game Enterprises, 893 So.2d at 366 (footnote omitted). The Court of Civil Appeals then
"conclude[d] that whether a game or activity constitutes a `lottery' depends on whether chance remains `an integral part which influences the result'  is chance meaningful in determining the outcome of the game  or does skill override the effect of the chance? Does chance, as the [State ex rel. Inf.] McKittrick [v. Globe-Democrat Publishing Co., 341 Mo. 862, 110 S.W.2d 705(1937)] Court put it, `proximately influence[] the final result,' or does skill, in the words of the United States Supreme Court in Horner[ v. United States, 147 U.S. 449, 13 S.Ct. 409, 37 L.Ed. 237 *384 (1893)], `destroy the existence or effect' of the chance? If the former and not the latter, it can hardly be said that the skill predominates over the chance in the qualitative or causative sense contemplated.
"As long as chance matters  as long as chance makes a meaningful difference in the outcome  the activity differs in kind, not just in degree, from a game of skill. The issue is whether the nature of the game is such that the role of chance in determining the outcome is thwarted by the skill involved, or whether chance meaningfully alters the outcome and thereby predominates over the skill.
"....
"... [T]he word `skill' speaks to [a person's] ability, through the application of human physical or mental capacity, to actually cause a desired outcome of a game when the game is played.
"Further, the mere fact that the outcome of a game, either in a single play or over multiple plays, can be affected by an understanding of the laws of probability or an understanding of the rules of the game, or can be affected by other recognizable techniques or knowledge, does not change the fundamental nature of that game. Simply put, a player's understanding of the rules or of the laws of probability relating to a game of chance does not change the fact that he is playing a game of chance. A player may be `skilled' at `playing the odds,' but he is still `playing the odds.'
"IV. Conclusion

"In light of the foregoing, we hold that § 13A-12-76, Ala.Code 1975, may not be applied in the manner urged by Ted's. To the contrary, § 13A-12-76 may not, without contravening § 65 of the Alabama Constitution, be applied so as to legalize games or activities in which skill does not, as discussed herein, predominate over chance in determining the outcome.
"That portion of the trial court's judgment relating to the State's declaratory-judgment claim is reversed and a judgment is rendered for the State in accordance with this opinion."
Ted's Game Enterprises, 893 So.2d at 376 (footnote omitted).
I will first demonstrate that § 13A-12-76 does, by its terms and effect, legalize bona fide coin-operated amusement machines which allow "some skill" "in whole or in part" to influence the operation of the machines to yield prizes of no more than 25 free replays or of merchandise worth no more than five dollars wholesale. Next, I will explain why that legalization does not violate the prohibition against lotteries and gift enterprises in Art. IV, § 65, Alabama Constitution of 1901.
"The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect. Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So.2d 687 (Ala.1991)."
IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala.1992). "Courts will attempt to give meaning to a legislative enactment and it is presumed that the Legislature did not do a vain and useless thing." Alidor v. Mobile County Comm'n, 291 Ala. 552, 558, 284 So.2d 257, 261 (1973). "Sections of the Code dealing *385 with the same subject matter are in pari materia. As a general rule, such statutes should be construed together to ascertain the meaning and intent of each." Locke v. Wheat, 350 So.2d 451, 453 (Ala.1977) (citations omitted).
"In the event of a conflict between two statutes, a specific statute relating to a specific subject is regarded as an exception to, and will prevail over, a general statute relating to a broad subject. Murphy v. City of Mobile, 504 So.2d 243 (Ala.1987); Bouldin v. City of Homewood, 277 Ala. 665, 174 So.2d 306 (1965)."
Ex parte Jones Mfg. Co., 589 So.2d 208, 211 (Ala.1991).
The statutes to be applied are § 13A-12-20, § 13A-12-22, § 13A-12-27, § 13A-12-29, §§ 13A-12-70 through -75, and § 13A-12-76, Ala.Code 1975. Section 13A-12-20, in pertinent part, contains these definitions:
"(5) GAMBLING DEVICE. Any device, machine, paraphernalia or equipment that is normally used or usable in the playing phases of any gambling activity, whether that activity consists of gambling between persons or gambling by a person involving the playing of a machine. However, lottery tickets, policy slips and other items used in the playing phases of lottery and policy schemes are not gambling devices within this definition.
"(6) LOTTERY OR POLICY. An unlawful gambling scheme in which:
"a. The players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other medium, one or more of which chances are to be designated by the winning ones; and
"b. The winning chances are to be determined by a drawing or by some other fortuitous method; and
"c. The holders of the winning chances are to receive something of value.
"....
"(10) SLOT MACHINE. A gambling device that, as the result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such a manner that, depending upon elements of chance, it may eject something of value. A device so constructed or readily adaptable or convertible to such use is no less a slot machine because it is not in working order or because some mechanical act of manipulation or repair is required to accomplish its adaptation, conversion or workability. Nor is it any less a slot machine because apart from its use or adaptability as such it may also sell or deliver something of value on a basis other than chance."
Section 13A-12-22 provides:
"(a) A person commits the crime of promoting gambling if he knowingly advances or profits from unlawful gambling activity otherwise than as a player.
"(b) Promoting gambling is a Class A misdemeanor."
Section 13A-12-27 provides:
"(a) A person commits the crime of possession of a gambling device if with knowledge of the character thereof he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of:
"(1) A slot machine; or
"(2) Any other gambling device, with the intention that it be used in *386 the advancement of unlawful gambling activity.
"(b) Possession of a gambling device is a Class A misdemeanor."
Section 13A-12-29 provides:
"It is no defense under Section 13A-12-22 relating to a lottery that the lottery itself is drawn or conducted outside Alabama and is not in violation of the laws of the jurisdiction in which it is drawn or conducted."
Sections 13A-12-70 through -75 address these respective subjects: seizure of vehicles transporting lottery paraphernalia, procedure for condemnation and forfeiture of vehicles transporting lottery paraphernalia, rights of mortgagee to condemned vehicles, sale of forfeited vehicles, disposition of proceeds from sale of forfeited vehicles, and exception of vehicles transporting paraphernalia for a numbers game or a policy game. Section 13A-12-76 provides, in pertinent part:
"(a) Sections 13A-12-70 to 13A-12-75, inclusive, shall not apply to a coin-operated game or device designed and manufactured for bona fide amusement purposes which, by application of some skill, only entitles the player to replay the game or device at no additional cost if a single play of the bona fide coin-operated amusement machine or device can reach no more than 25 free replays or can be discharged of accumulated free replay, or rewards the player exclusively with merchandise limited to noncash merchandise, prizes, toys, gift certificates, or novelties, each of which has a wholesale value of not more than five dollars ($5). This subsection shall not apply to any game or device classified by the United States government as requiring a federal gaming tax stamp under applicable provisions of the Internal Revenue Code.
"....
"(e)(1) For purposes of this section, `bona fide coin-operated amusement machine' means every machine of any kind or character used by the public to provide amusement or entertainment whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, or similar object, and the result of whose operation depends in whole or in part upon the skill of the player, whether or not it affords an award to a successful player, and which can be legally shipped interstate according to federal law. Examples of bona fide coin-operated amusement machines include, but are not limited to, the following:
"a. Pinball machines.
"b. Console machines.
"c. Video games.
"d. Crane machines.
"e. Claw machines.
"f. Pusher machines.
"g. Bowling machines.
"h. Novelty arcade games.
"i. Football or table soccer machines.
"j. Miniature racetrack or football machines.
"k. Target or shooting gallery machines.
"l. Basketball machines.
"m. Shuffleboard games.
"n. Kiddie ride games.
"o. Skeeball machines.
"p. Air hockey machines.
"q. Roll down machines.
"r. Coin-operated pool table or coin-operated billiard table.
"s. Any other similar amusement machine which can be legally operated in Alabama.

*387 "t. Every machine of any kind or character used by the public to provide music whose operation requires the payment of or the insertion of a coin, bill, other money, token, ticket, or similar object, such as jukeboxes or other similar types of music machines.
"(2) The term `bona fide coin-operated amusement machine' does not include the following:
"a. Coin-operated washing machines or dryers.
"b. Vending machines which for payment of money dispense products or services.
"c. Gas and electric meters.
"d. Pay telephones.
"e. Cigarette vending machines.
"f. Coin-operated scales.
"g. Coin-operated gumball machines.
"h. Coin-operated parking meters.
"i. Coin-operated television sets which provide cable or network programming.
"j. Machines which are not legally permitted to be operated in Alabama.
"k. Slot machines.
"l. Video poker games." (Emphasis added.)
The meaning of § 13A-12-76 insofar as it addresses the requisite skill of a player of a bona fide coin-operated amusement machine is plain and unambiguous. The express and plain language of § 13A-12-76 requires that the machine allow "some skill" "in whole or in part" to influence the operation of the machines to yield prizes. The decision of the Court of Civil Appeals, in effect, rewrites and increases the skill requirement as though the statute were to require that skill "destroy the existence or effect of ... chance," Ted's Game Enters., 893 So.2d at 372 (internal quotation marks omitted). This gratuitous rewriting of § 13A-12-76 by the Court of Civil Appeals violates Art. III, § 43, Alabama Constitution of 1901, which prohibits the courts from exercising legislative powers.
The State next argues, in effect, that subsection (e)(2)j. of § 13A-12-76 nullifies § 13A-12-76 in its entirety. Section 13A-12-76(e)(2)j. excludes from the protection of § 13A-12-76 "[m]achines which are not legally permitted to be operated in Alabama." The Legislature has not defined "[m]achines which are not legally permitted to be operated in Alabama." The most likely and reasonable meaning of the term "machines which are not legally permitted to be operated in Alabama," is "gambling device[s]" as defined by § 13A-12-20(5) and as prohibited by § 13A-12-27. Sections 13A-12-20(5) and 13A-12-27 read together constitute a general statute prohibiting gambling devices. Section 13A-12-76 is a specific statute legalizing bona fide coin-operated amusement machines as defined. Therefore, § 13A-12-76 "is regarded as an exception to, and will prevail over" the general prohibition against gambling devices, Ex parte Jones Mfg. Co., 589 So.2d at 211. A contrary holding would, contrary to Alidor, supra, mean that the Legislature "did a vain and useless thing" by specifically defining and legalizing bona fide coin-operated amusement machines in § 13A-12-76.
Likewise, the State argues, in effect, that § 13A-12-76(e)(2)k., which excludes slot machines from the protection of § 13A-12-76, nullifies the whole section. "Slot machine" is expansively defined by § 13A-12-20(10), and slot machines are outlawed by § 13A-12-27, just like other gambling devices. Thus my analysis of this contention by the State is essentially the same as my analysis of the argument the State advances about § 13A-12-76(e)(2)j.
*388 Therefore, § 13A-12-76(a) and (e)(1) mean what they say. They legalize coin-operated amusement machines which allow "some skill" "in whole or in part" to influence the operation of the machines to yield prizes of no more than 25 free replays or of merchandise worth no more than five dollars wholesale.
I will next explain why the statute legalizing such machines does not violate Art. IV, § 65, which provides:
"The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."
Some legal history of this provision of the current Constitution is instructive.
In 1873, in Chavannah v. State, 49 Ala. 396 (1873), this Court construed the term lottery in a criminal statute prohibiting the operation of lotteries not authorized by law. In Chavannah, the defendant-appellant had been convicted of violating the statute by operating a game dependent on a wheel similar to a roulette wheel. The Chavannah Court stated:
"The good or bad fortune of the party making the risk did not depend for success upon any skill of the player in the control of the event which entitled him to win. That depended wholly upon lot or chance. Lot is defined to be `a contrivance kto determine a question by chance, or without the action of man's choice or will.' Webster's Dict. Unab. When such a contrivance is applied to gaming, where the chances are sold before the game is played, it is a lottery under our Criminal Code. Rev.Code, § 3616; 2 Bish. Cr. L. § 469; Bill v. The State, 37 Tenn. 507, 5 Sneed, 507."
49 Ala. at 398 (emphasis added). Because the game depended wholly on chance and not on "any skill," the Court held that the game constituted a lottery. Thus the Court affirmed the defendant's conviction for operating a lottery not authorized by law.
Thereafter, the Constitution of 1875 was adopted. It included Art. IV, § 26, the predecessor to Art. IV, § 65 of the current Constitution. Art. IV, § 26, of the 1875 Constitution read:
"Sec. 26. The general assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery, in this State; and all acts, parts of acts, heretofore passed by the general assembly of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."
This section was the first constitutional prohibition against lotteries or gift enterprises in Alabama. This section of the 1875 Constitution implicitly adopted the Chavannah construction of the term lottery. Hall v. Blan, 227 Ala. 64, 148 So. 601 (1933).
Thereafter, in 1897, Loiseau v. State, 114 Ala. 34, 22 So. 138 (1897), interpreted Art IV., § 26 of the 1875 Constitution. In Loiseau, the defendant-appellant had been convicted of operating "a lottery ... to-wit, a slot machine." 114 Ala. at 36, 22 So. at 138. In affirming the defendant's conviction, the Loiseau Court adopted the Chavannah construction of the term lottery. The Loiseau Court stated and held:
"Lot has been correctly defined to be `a contrivance to determine a question by *389 chance, or without the action of man's choice or will.' To be a criminal lottery, there must be a consideration; and when small amounts are hazarded to gain large amounts, and the result of winning to be determined by the use of a contrivance of chance, in which neither choice nor skill can exert any effect, it is gambling by lot, or a prohibited lottery."
114 Ala. at 38, 22 So. at 139 (emphasis added). In Loiseau as in Chavannah, the critical defining characteristic of a lottery is that "skill can[not] exert any effect." (Emphasis added.)
Thereafter, the Constitution of 1901 was adopted, with Art. IV, § 65 as the readoption of Art. IV, § 26. "By the readoption of [a] clause [in the Constitution of 1875] the construction placed upon the Constitution of 1875, became thereby adopted by the constitutional convention of 1901." General Motors Acceptance Corp. v. Home Loan & Fin. Co., 218 Ala. 681, 683, 120 So. 165, 166 (1928). Accord Ex parte Gauntt, 677 So.2d 204, 212 n. 5 (Ala.1996); White v. White, 230 Ala. 641, 649, 162 So. 368 (1935); and Ex parte Western Union Tel. Co., 200 Ala. 496, 76 So. 438 (1917).
Chavannah and Loiseau, supra, require that a game, scheme, or device depend wholly and solely on chance or lot rather than some skill in order to constitute a lottery. To the same effect are Opinion of the Justices No. 83, 249 Ala. 516, 31 So.2d 753 (1947) (Lawson, Simpson, and Livingston, JJ., issuing separate opinions), Minges v. City of Birmingham, 251 Ala. 65, 36 So.2d 93 (1948), and Opinion of the Justices No. 358, 692 So.2d 107 (Ala.1997). By readopting Art. IV, § 26, Alabama Constitution of 1875, without material change as Art. IV, § 65, Alabama Constitution of 1901, the constitutional convention of 1901 adopted as part of that section our prior construction of the term "lottery" as a game, scheme, or device wholly and solely dependant on chance or lot rather than some skill. Ex parte Gauntt, White, General Motors Acceptance Corp., and Ex parte Western Union Telegraph Co., supra. See Opinion of the Justices No. 83 (Lawson, Simpson, and Livingston, JJ., issuing separate opinions), Minges, and Opinion of the Justices No. 358. To the extent that Opinion of the Justice No. 373, 795 So.2d at 641 (quoting 38 C.J. Lotteries § 5 (1925)), four Justices concurring, opines that a lottery "`includes those schemes wherein chance is the dominant factor in determining the result, although it may be affected to some degree by the exercise of skill or judgment,'" that opinion is inconsistent with the definition of a lottery expressed in Loiseau and Chavannah, supra, adopted as part of the construction of Art. IV, § 65, and followed in Minges, Opinion of the Justices No. 83 (Lawson, Simpson, and Livingston, JJ., issuing separate opinions), and Opinion of the Justices No. 358. Thus, we should not adopt the definition of a lottery expressed by the four Justices in Opinion of the Justice No. 373.
This Court explained, for the first time, the term "gift enterprises" in State v. Shugart, 138 Ala. 86, 92-93, 35 So. 28, 29-30 (1903):
"Without the aid of a statutory definition of a `gift enterprise,' such as the statute intended to prohibit, we are left to determine its meaning by the context of the statute in which it is employed, and the definitions given by the lexicographers, as well as by decisions of other courts. In Lohman v. State, 81 Ind. [15,] 17 [(1881)], the court took judicial notice that the phrase `gift enterprise' as used in the statute of the State  Indiana  against lotteries, meant substantially `a scheme for the division or distribution of certain articles of property, *390 to be determined by chance, amongst those who had the shares in the scheme.'
"In Bouvier's Law Dic., Rawles's Revision, Vol. 1, page 884, the following definition is given: `Gift Enterprise. A scheme for the division or distribution of certain articles of property, to be determined by chance, amongst those who have taken shares in the scheme; the phrase has attained such a notoriety as to justify courts in taking judicial notice of what is meant and understood;' citing 81 Ind. [at] 17, and [Scudder v. Bradbury,] 106 Mass. 422 [(1871)]. The same definition is given in Black's Law Dic. 539 as that above.
"In Anderson's Law Dic. p. 488, the following definition is given: `A gift enterprise, in common parlance, is a scheme for the division or distribution of certain articles of property, to be determined by chance, among those who have taken shares in the scheme.'
"Thus it will be seen, that to constitute a `gift enterprise,' such as is denounced by the statute, the element of chance must enter into the scheme....
"... And as stated above, our statute is plainly intended to suppress the evil of gaming  and the `gift enterprise' denounced, like the lottery, is such a scheme, device, or contrivance into which the element of chance enters in the determination of results." (Emphasis added.)
Thus, in a "gift enterprise," as in a lottery, winning is "determined by chance" with no allowance for the influence of skill.
Legislators are presumed to know the preexisting judicial interpretations on subjects the legislators are addressing in prospective or pending legislation. See Jones v. Conradi, 673 So.2d 389 (Ala.1995). The text of § 13A-12-76(a) and (e)(1) manifests that the Legislature included the requirement of the skill factor ("some skill" "in whole or in part" to influence the operation) for an amusement machine to be legalized by the section specifically to heed and to obey the Art. IV, § 65 prohibition against legalizing lotteries and gift enterprises as then defined by caselaw. The amusement machines legalized by § 13A-12-76 do not fit within the judicial definition of the lotteries and gift enterprises proscribed by Art. IV, § 65. Therefore Art. IV, § 65 does not prohibit or proscribe § 13A-12-76, and § 13A-12-76 as applied by the trial court in this case does not violate Art. IV, § 65.
The Court of Civil Appeals erred in holding to the contrary. Therefore, I respectfully submit that we should reverse the judgment of the Court of Civil Appeals and should render judgment affirming the judgment of the trial court.
SEE, Justice (statement of nonrecusal).
The petitioner, Ted's Game Enterprises, Inc. ("Ted's"), has moved for my recusal, as well as the recusal of Justice Jean Brown and Justice Lyn Stuart. Because I find that there is no reasonable basis for questioning my impartiality, I decline to recuse myself.[4]

I.
Ted's has moved for our recusals in this case because of the advisory opinion we issued in Opinion of the Justices No. 373, 795 So.2d 630 (Ala.2001). Opinion of the Justices No. 373 addressed Senate Bill 257, which would, among other things, *391 have exempted certain wagering activities and "skill dependent" wagering games from criminal or civil prohibitions. Justice Brown, Justice Stuart, and I joined in the opinion that if enacted, Senate Bill 257 would have violated the prohibition against lotteries found in § 65 of the Constitution of Alabama of 1901.
Ted's argues that because of our writing in Opinion No. 373 our "`impartiality might reasonably be questioned' under Canon of Judicial Ethics 3C(1)." Canon 3.C.(1) provides:
"A judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned, including but not limited to instances where:
"(a) He has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding...."
Ted's also argues that our comments in Opinion No. 373 are inconsistent with Canon 3.A.(6), which provides:
"A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to his direction and control. This subsection does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court."

II.
One of the main issues in the underlying case is "the constitutionality of § 13A-12-76 in relation to Alabama Constitution 1901, Art. IV, § 65." State of Alabama ex. rel. Tyson v. Ted's Game Enters., 893 So.2d 355, 359 (Ala.Civ.App.2002). Section 13A-12-76, Ala.Code 1975, exempts from the criminal gambling laws of the State certain games that involve "some skill." The Court of Civil Appeals held that "§ 13A-12-76 may not, without contravening § 65 of the Alabama Constitution, be applied so as to legalize games or activities in which skill does not, as discussed herein, predominate over chance in determining the outcome." 893 So.2d at 376. Ted's has petitioned this Court for the writ of certiorari seeking a reversal of the Court of Civil Appeals' decision.
While this case was pending in the Court of Civil Appeals, the House of Representatives presented this Court with the following question: "Is Senate Bill 257 [which would have allowed state and local taxation of skill-dependent wagering games] a revenue-raising measure which needs to originate in the House of Representatives?" In response to the question presented to us, this Court issued Opinion of the Justices No. 373, in which Justice Brown, Justice Stuart, and I expressed our opinions that Senate Bill 257, if enacted in its then current form, would have violated Art. IV, § 65, of the Constitution of Alabama of 1901, and that, therefore, it was irrelevant whether the bill originated in the House of Representatives or in the Senate.[5]

III.
When a judge reaches conclusions of fact or law in an official capacity, those *392 conclusions cannot be the basis for the judge's recusal. In his treatise, Richard Flamm discusses the general principle that a judge need not recuse himself for having expressed a particular opinion or viewpoint on an issue of law or policy:
"[I]t generally has been agreed that a judge having expressed herself on a particular point of law or policy  in what she conceives to be a discharge of her official duties  is insufficient to establish the type of personal bias that would prevent the judge from being entirely fair and impartial in the trial of the case.
"Consequently, a judge's expressing a viewpoint on a legal issue is generally not deemed to be disqualifying in and of itself; this is usually true without regard to where such judicial views are expressed, and even if they are expressed somewhat prematurely or harshly."
Richard E. Flamm, Judicial Disqualification § 10.7 (1996). In Laird v. Tatum, 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972), Justice Rehnquist denied a motion that he recuse himself based upon previous testimony he had given on behalf of the Department of Justice. He stated:
"Since most Justices come to this bench no earlier than their middle years, it would be unusual if they had not by that time formulated at least some tentative notions which would influence them in their interpretation of the sweeping clauses of the Constitution and their interaction with one another. It would be not merely unusual, but extraordinary, if they had not at least given opinions as to constitutional issues in their previous legal careers. Proof that a Justice's mind at the time he joined the Court was a complete tabula rasa in the area of constitutional adjudication would be evidence of lack of qualification, not lack of bias.
"Yet whether these opinions have become at all widely known may depend entirely on happenstance. With respect to those who come here directly from private life, such comments or opinions may never have been publicly uttered. But it would be unusual if those coming from policy making divisions in the Executive Branch, from the Senate or House of Representatives, or from positions in state government had not divulged at least some hint of their general approach to public affairs, if not as to particular issues of law. Indeed, the clearest case of all is that a Justice who comes to this Court from a lower court, and has, while sitting as a judge of the lower court, had occasion to pass on an issue which later comes before this Court. No more compelling example could be found of a situation in which a Justice had previously committed himself. Yet it is not and could not rationally be suggested that, so long as the cases be different, a Justice of this Court should disqualify himself for that reason."
Laird, 409 U.S. at 835, 93 S.Ct. 7.
Ted's argues that by virtue of having considered the constitutionality of Senate Bill 257 in Opinion of the Justices No. 373, I should recuse myself from this case in which "[a] primary issue presented ... is the constitutionality of Alabama Code § 13A-12-76"  a question that Ted's believes is similar to the question addressed in Opinion of the Justices No. 373. However, the very nature of my role as a judge requires that I be able to decide issues of *393 law and fact presented to me. Thus, my recusal is not required because of conclusions expressed in my opinions, whether advisory or otherwise.[6]See, e.g., United States v. Carmichael, 726 F.2d 158, 160 (1984)("A denial of recusal is thus not an abuse of discretion if the complaint is `merely based upon the judge's rulings in the instant case or related cases ....'") (quoting Phillips v. Joint Legislative Committee, 637 F.2d 1014, 1021 (5th Cir.1981)); In re Sheffield, 465 So.2d 350, 357 (Ala.1984) ("`[R]ulings on issues of law or attitudes concerning legal issues' do not establish bias or prejudice requiring recusal unless those rulings or attitudes are the product of bias and prejudice of an extra-judicial source."); McWhorter v. City of Birmingham, 906 F.2d 674, 678 (11th Cir.1990)("Ordinarily, a judge's rulings in the same or a related case may not serve as the basis for a recusal motion.... The judge's bias must be personal and extrajudicial; it must derive from something other than that which the judge learned by participating in the case.").
Moreover, the Justices have made clear that the conclusions reached in an advisory opinion may not be the same as those reached by the Court in an actual case or controversy:
"In issuing advisory opinions, the members of this Court consider in the abstract the question submitted for consideration, without adverse parties and without the benefit of briefing or of an actual case or controversy; in an actual case or controversy, we might reach a different conclusion. See Opinion of the Justices No. 188, 280 Ala. 692, 703, 198 So.2d 269, 280 (1967) ('"The performance by the Justices of the function [§ 12-2-10] contemplates is non-judicial; this for the obvious reason that advisory opinions given do not conclude or vindicate any right or remedy, result in no judgment or decree, bind no one whatsoever."') (quoting Opinions of the Justices No. 1, 209 Ala. 593, 594, 96 So. 487, 488-89 (1923))."
Opinion of the Justices No. 380, 892 So.2d 332, 334 (Ala.2004).

IV.
"Canon 3(C)(1)(a) requires recusal in the event that a judge harbors a personal bias or prejudice concerning a party, for any reason." Ala. Jud. Inquiry Comm'n Adv. Op. 95-578 (October 6, 1995). In addition, "Canon 3(C)(1) provides that a judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned." Id. The relevant inquiry is: "`Would a person of ordinary prudence in the judge's position knowing all the facts known to the judge find that there is a reasonable basis for questioning the judge's impartiality?'" In re Sheffield, 465 So.2d at 356 (quoting E. Wayne Thode, The Code of Judicial Conduct  The First Five Years in the Courts, 1977 Utah L.Rev. 395, 409). In this case, I have no *394 actual bias against Ted's, and there are no facts that would reasonably cause my impartiality with respect to Ted's to be questioned.
Canon 3.C.(1)(a) provides that a judge should disqualify himself in any proceeding where "[h]e has a personal bias or prejudice concerning a party...." (Emphasis added.) The advisory opinions in Opinion of the Justices No. 373 were in response to a question concerning a proposed bill before the Alabama Senate. There is no evidence in Opinion of the Justices No. 373 of a bias against Ted's, and I have no such bias. "`"`"[T]he law will not suppose a possibility of bias or favor in a judge who is already sworn to administer impartial justice and whose authority greatly depends upon that presumption and idea."'"'" Ex parte Monsanto Co., 862 So.2d 595, 605 (Ala.2003) (quoting Ex parte Little, 837 So.2d 822, 825 (Ala.2002), quoting in turn Ex parte Melof, 553 So.2d 554, 557 (Ala.1989), quoting in turn other cases). In the absence of actual bias, or the appearance of actual bias, there is no basis for my recusal and I am duty-bound to participate in this case.[7]

V.
Because it is my constitutional duty to decide this case, I decline to recuse myself.
BROWN, Justice (statement of nonrecusal).
I decline to recuse myself in this case for the reasons stated by Justice See in his statement of nonrecusal; however, I express no opinion as to note 5 in Justice See's statement.
STUART, Justice (statement of nonrecusal).
I decline to recuse myself in this case for the reasons stated by Justice See in his statement of nonrecusal.
NOTES
[1] This case was originally assigned to another Justice on this Court, but it was reassigned to Justice Brown.
[2] For a detailed discussion of the facts and procedural history of this case, see State ex rel. Tyson v. Ted's Game Enterprises, 893 So.2d 355 (Ala.Civ.App.2002).
[3] Ted's refers to such games as "some skill" games, as opposed to those games in which skill predominates over chance in determining the outcome.
[4] It is unclear whether the motion requesting my recusal is addressed to me individually or to the entire Court; however, recusal is a matter properly submitted first to the justice whose recusal is sought, and only thereafter to the entire Court. See Aetna Life Ins. Co. v. Lavoie, 470 So.2d 1060, 1089 (Ala.1984), vacated on other grounds, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1996). I therefore treat this motion as one directed to me.
[5] I wrote specially in Opinion of the Justices No. 373, noting that in an earlier advisory opinion, Opinion of the Justices No. 358, 692 So.2d 107, 113 (Ala.1997), I had already stated that § 65 of the Constitution of Alabama prohibits a game for consideration that requires only that "some skill is involved." Senate Bill 257, the subject of Opinion of the Justices No. 373, adopted this same premise that only "some" skill is required in order for a gambling statute to comply with § 65. Thus, I stated that because I had already addressed the unconstitutionality of statutes that allow gambling where only "some" degree of skill is required, I did not have to address whether it was necessary to answer that constitutional question in order to dispose of the question presented in Opinion of the Justices No. 373. Therefore, I concluded, to say "that the unconstitutional bill may or must originate in one house or the other would imply that my understanding of Art. IV, § 65, has changed. It has not." 795 So.2d at 647.
[6] Section 12-2-10, Ala.Code 1975, authorizes this Court to issue advisory opinions. It provides that "[t]he Governor, by a request in writing, or either house of the Legislature, by a resolution of such house, may obtain a written opinion of the justices of the Supreme Court of Alabama or a majority thereof on important constitutional questions." Moreover, this Court has stated that "we provide advisory opinions as an aid to legislators in fulfilling their constitutional responsibilities." Opinion of the Justices No. 380, 892 So.2d 332, 333-34 (Ala.2004). Thus, it was as a part of my judicial obligation, pursuant to § 12-2-10, Ala.Code 1975, that I answered the House of Representatives' request for an advisory opinion in Opinion of the Justices No. 373.

Ted's criticizes certain aspects of this Court's practice of issuing advisory opinions, a practice Ted's says permits "a detailed exposition of the law" "without a record, any evidence or legal briefs or anything resembling an adversary proceeding." This is a concern better addressed by the Legislature.
[7] law of recusal reflects two fundamental judicial policies: First, it is the duty of a judge to decide cases. Second, a judge should be a neutral, or impartial, decision-maker. The Constitution of the United States and the Constitution of Alabama of 1901 impose on judges the duty to decide cases. See U.S. Const. art. III, § 1 (vesting the `judicial Power of the United States ... in one supreme court, and in such inferior courts as the Congress may from time to time ordain and establish'); id. at art. VI (`[A]ll ... judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution....'); Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 218-19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (`Article III establishes a "judicial department" with the "province and duty" ... to decide ... "case[s]."') (quoting Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)(emphasis added)); Marbury, 5 U.S. at 180 (stating that a judge's oath to support the Constitution requires that he exercise the judicial power and decide cases in a manner consistent with fundamental law); Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)(`It is a judge's duty to decide all cases within his jurisdiction....'); Ala. Const.1901 amend. 328, § 6.01(a) (`[T]he judicial power of the state shall be vested exclusively in a unified judicial system which shall consist of a supreme court ....'); id. at § 279 (requiring `all officers, executive and judicial, ... [to] take the following oath or affirmation: "I, _______, solemnly swear ... that I will support the Constitution of the United States, and the Constitution of the State of Alabama... and that I will faithfully and honestly discharge the duties of the office upon which I am about to enter"'); Federated Guaranty Life Ins. Co. v. Bragg, 393 So.2d 1386, 1389 (Ala.1981) ('"[I]t is the duty of the judge to adjudicate the decisive issues involved in the controversy ... and to make binding declarations concerning such issues, thus putting the controversy to rest...."') (citation omitted)."
Dunlop Tire Corp. v. Allen, 725 So.2d 960, 976 (Ala.1998)(See, J., statement of nonrecusal).